## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| 3J'S PRODUCTIONS, INC., JASON HOPLEY and JACK LENZ, | Civil Case No. _____ |
| Plaintiffs, | |
| -against- | **COMPLAINT** |
| JAMIE SHANNON, PUPPET ISLAND, INC., | |
| Defendants. | |

Plaintiffs Jason Hopley ("Hopley"), Jack Lenz ("Lenz"), 3J's Productions, Inc. ("3J's," and collectively, "Plaintiffs"), by and through their undersigned counsel, Dentons US LLP, as and for their Complaint against Defendants Jamie Shannon ("Defendant" or "Shannon") and Puppet Island, Inc. ("Puppet Island," and collectively, "Defendants") hereby allege as follows:

### NATURE OF THE ACTION

1.      This action for trademark infringement, tortious interference with prospective economic advantage, unfair competition, and unjust enrichment arises from, *inter alia*, Defendants' repeated, wanton, and intentional exploitative and unauthorized use of characters, scenes, and phrases associated with the television show, Nanalan' (the "Nanalan' Property"), which is owned by 3J's. Moreover, Defendants have repeatedly used the NANALAN' trademark, which acts have caused confusion in the public and undermine Plaintiffs' reputation and goodwill. Defendants have also repeatedly and intentionally exploited the characters, scenes, and phrases associated with the television show, Mr. Meaty (the "Mr. Meaty Property").

2.     Without limitation, Defendants have repeatedly made unauthorized use of the Nanalan' Property and Mr. Meaty Property on Cameo, Etsy, other e-commerce platforms, and social media for his own financial and reputational benefit.   .

3.     Defendants have further sought to fleece Plaintiffs of their highly valuable 3J's intellectual property.  Hopley, Lenz, and Defendant are all 3J's shareholders of and all signatories on 3J's Shareholder Agreement ("Shareholder Agreement").  Defendants actions have caused harm to 3J's shareholders, namely, Plaintiffs.

4.     Defendants' misuse has been egregious; Shannon has created and sold videos on the e-commerce platform Cameo featuring the Nanalan' Property and infringing on the NANALAN' trademark; Defendants have established numerous online stores on e-commerce websites, including but not limited to Etsy and Amazon, where Shannon peddled goods featuring the Nanalan' Property and/or infringing on the NANALAN' trademark; and Defendants have opened social media accounts on popular websites including but not limited to YouTube, Instagram, Twitter, and TikTok where Shannon posted content featuring the Nanalan' Property and infringing on the NANALAN' trademark.

5.     Shannon directed payments received for these actions to his personal accounts and that of Puppet Island.

6.     This scheme benefited Defendants, and Defendants alone.

7.     Hopley and Lenz repeatedly demanded Defendants to cease and desist.  Defendants have ignored these warnings.

8.     Unless preliminarily and permanently enjoined, Defendants will continue to cause irreparable harm and will exploit and engage in unauthorized use of the Nanalan' Property solely to enrich Defendants at Plaintiffs' expense.

9.      Defendants' actions have also materially harmed Plaintiffs economically, as well as 3J's goodwill, the Nanalan' Property, and future business prospects.

10.      Defendants' actions are willful and wanton.

11.      Plaintiffs therefore seek statutory damages, compensatory damages, punitive damages, injunctive relief, pre-judgment and post-judgment interest, and attorneys' fees and costs.

## THE PARTIES

12.      Plaintiff 3J's is a corporation established and existing under the laws of the Province of Ontario and the laws of Canada.

13.      Plaintiff Hopley is a natural person and citizen of Canada.  Hopley is a shareholder in 3J's.

14.      Plaintiff Lenz is a natural person and citizen of Canada.  Lenz is a shareholder in 3J's.

15.      Defendant Shannon is a natural person and citizen of Canada.  Defendant Shannon is a shareholder in 3J's.

16.      Defendant Puppet Island is a corporation established and existing under the laws of the Province of Ontario and the laws of Canada.

## JURISDICTION AND VENUE

17.      This is an action for unfair competition and trademark infringement arising under the Lanham Act, 15 U.S.C. §§ 1125 *et seq*.

18.      This Court has jurisdiction of this action under 28 U.S.C. §§ 1331, 1338(a), and 1338(b).  The Court has supplemental jurisdiction over the claims in this action under 28 U.S.C. § 1367.

19.     This Court has subject personal jurisdiction over Defendants because Defendants maintained sufficient minimum contacts with this State such that the exercise of personal jurisdiction over Defendants would not offend traditional notions of fair play and substantial justice.  Defendants have committed tortious acts within Illinois and have also committed tortious acts outside of Illinois causing injury to Plaintiffs within Illinois.

20.     On information and belief, Defendants have derived significant revenues for posting and/or creating content invoking the Nanalan' Property and the Mr. Meaty Property published to Baron App, Inc. d/b/a Cameo ("Cameo"), an Illinois company, headquartered at 2045 West Grand Avenue, Suite B, PMB 71534, Chicago IL 60612-1577.

21.     As detailed further below, Plaintiffs have attempted to end Defendants' unauthorized use of the Nanalan' Property by various means, including sending a Digital Millenium Copyright Act ("DMCA") Notice to Cameo requesting the disabling of webpages hosting Defendant's unauthorized content.

22.     In response, Shannon sent a DMCA counter-notice by and through Cameo's Intellectual Property Team, furthering the nexus between Shannon's acts and reliance on Cameo, which is headquartered in this judicial district.

23.     Defendants have repeatedly utilized and transacted with numerous Illinois and United States-based entities in furtherance of these certain tortious acts.

24.     Shannon has created and sold videos, apparel, and other goods and services featuring the Nanalan' Property and infringing on the NANALAN' trademark through numerous United States-headquartered e-commerce and social media platforms in furtherance of the scheme alleged herein, including but not limited to:

4

a. Etsy Inc. ("Etsy"), a New York company, headquartered at 117 Adams St Brooklyn, NY 11201;

b. Uncute Inc. ("Uncute"), a New York company, headquartered at 636 Broadway, Suite 601, New York, NY 10012;

c. Amazon.com, Inc. ("Amazon"), a Washington company, headquartered at 410 Terry Avenue North, Seattle, WA, 98109;

d. Facebook, Inc. ("Facebook"), a California company, headquartered at 1 Hacker Way, Menlo Park, CA 94025;

e. YouTube, LLC ("YouTube"), a California company, headquartered at 901 Cherry Ave. San Bruno, CA 94066;

f. Instagram LLC ("Instagram"), a California company, headquartered at 1601 Willow Road, Menlo Park, California 94025; and

g. X Corp. (formerly Twitter) ("Twitter"), a Texas company, headquartered at Building 2, 865 FM-1209, Bastrop, TX 78602.

25. Shannon and Puppet Island have each derived significant revenue employing the Nanalan' Property throughout the United States.

26. Plaintiffs' claims arise out of and relate to Defendant's transactions of business, and tortious acts committed in Illinois and outside of Illinois, causing damage to Plaintiffs in Illinois because, *inter alia*, Shannon has: repeatedly posted content to Cameo exploiting or otherwise invoking the Nanalan' Property; Defendants have repeatedly received payments for posts to Cameo and other e-commerce platforms; repeatedly caused Cameo and other e-commerce platforms to tortiously interfere in the performance of, and Shannon's conduct in respect of the obligations under, the Shareholders Agreement by directing payment to Shannon and/or Puppet

5

Island for Shannon's sole benefit; repeatedly engaged in exploitative and unauthorized use of the Nanalan' Property through various public channels, including Cameo, Etsy, e-commerce, and social media, which are all accessible within Illinois.

27.     Defendants also repeatedly used and/or associated themselves with the trademark NANALAN', which is owned by 3J's without authorization.

28.     Therefore, this Court has in personam long-arm jurisdiction over Defendants pursuant to 735 ILCS § 5/2-209.

29.     Venue properly lies in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the acts or omissions giving rise to Plaintiffs' claims occurred in this District.

## FACTUAL BACKGROUND

30.     In 1998, Canadian puppeteers Hopley and Defendant created Nanalan', a Canadian children's television show featuring a three-year-old girl named Mona, Mona's grandmother, Nana, and Nana's dog, Russel.  The title, Nanalan', refers to a contraction of the phrase "Nana's Land," named for the character Nana's backyard, where much of the show takes place.

31.     In its first year, Nanalan' was broadcast as a series of short videos, but the show later ran for two seasons of full-length episodes.  The show was broadcast by the Canadian Broadcasting Corporation from September 1, 2003 until 2007.  Nanalan' also aired in the United States on certain Public Broadcast Stations and Nickelodeon from July 2006 through 2013.

32.     Nanalan' featured distinctive puppetry and cardboard cutouts to create scenes and interactions between the characters.  On the official YouTube channel of Nanalan' the "about" page describes the show as a way to "heal your inner child."

33. Nanalan' was produced by Hopley, Lenz, and Shannon. The Nanalan' Property would not be possible without the foundational work of Hopley and Lenz in designing the characters, writing, directing, music, and creating the original show.

34. In connection with the production, Hopley, Lenz, and Shannon coined the trademark NANALAN' and began using same as early as 1998.

35. Plaintiffs spent substantial time, effort, and money to establish NANALAN' as a brand identity and has significant, valuable, goodwill in NANALAN'

36. NANALAN' is an inherently distinctive trademark with significant renown among the public.

37. Based on its ownership and use of the trademark NANALAN', 3J's owns common law trademark rights therein.

38. 3J's also owns several intent-to-use trademark applications for the mark NANALAN', including:

   a. Application No. App. No. 98616366, Class 9. This application covers the following goods: Protective sleeves for laptop computers; cases for mobile phones; portable power chargers; grips for mobile phones; cameras; headphones; earphones;

   b. Application No. 98616399, Class 14. This application covers the following goods: Keychains; jewelry; lanyards primarily for holding keys and identity cards;

   c. Application No. 98616439, Class 16. This application covers the following goods and services: Stickers; posters; stationery; decals;

d.   Application No. 98616470, Class 25.  This application covers the following goods:  Tops as clothing; sweatshirts; hoodies; bottoms as clothing; denim pants; denim shorts; dresses; skirts; jackets; tank tops; foul weather gear; headwear; gloves; scarves; loungewear; hosiery; headbands;

e.   Application No. 98616501, Class 26.  This application covers the following goods:  Ornamental novelty pins; novelty buttons; hair accessories, namely, hair barrettes, hair bands, hair bows, hair clips, hair ties, hair ornaments, hair pins, and hair scrunchies; hair wraps, bonnets and caps used as applicators for hair conditioners; decorative charms for mobile phones;

f.   Application No. 98616536, Class 28:  This application covers the following goods:  Dolls; soft sculpture toys; plush toys; toy figures.

39.   3J's also owns a use-based trademark application for the mark NANALAN', Application No. 98616563, Class 41.  This application covers the following goods and services: Entertainment services, namely, providing non-downloadable audio and video recordings featuring children's entertainment, education, popular culture and general human interest via the Internet; entertainment services, namely, a multimedia program series featuring children's entertainment, education, popular culture and general human interest distributed via various platforms across multiple forms of transmission media; providing information relating to entertainment, education and popular culture.

40.   Defendants do not claim ownership in the NANALAN' trademark and the rights therein.

41.   Defendants have never asserted that 3J's does not own the trademark NANALAN' and rights therein.

42. Defendants expressly concede that 3J's is the exclusive owner of the trademark NANALAN'.

43. As described herein, however, Defendants have and continue to use and engage in unauthorized use of the NANALAN' trademark, and, in so doing, are causing confusion in the marketplace, including without limitation, as to the source, ownership, business success, and goodwill associated with the NANALAN' trademark.

44. To provide governance and an ownership structure, Hopley, Lenz, and Shannon agreed to enter the Shareholders Agreement on July 12, 2002, which is attached as **Exhibit A**. At its inception, Hopley, Lenz, and Shannon all owed 33.3% of 3J's.

45. Section 4.5 of the Shareholders Agreement provides for, *inter alia*, a number of matters requiring approval by "Shareholders holding more fifty percent (50%) of the total number of voting shares in the capital of the Corporation," including but not limited to:

    a. "the Corporation or any subsidiary of the Corporation entering not any contracts, commitments or agreement with any Shareholders, directors or officers of the Corporation or any subsidiary of the Corporation or any persons who do not deal at arm's length with any of the Shareholders or any such directors or officers, or making any loans to any of the aforesaid persons" (4.5(a)); or

    b. "approval of the annual business plan and budget for the Corporation and its subsidiaries for any fiscal year and the taking of any action that will cause any material deviation therefrom in the operation of the business and affairs of the Corporation or any subsidiary of the Corporation;" (4.5(m)) or

    c.   "commencing any new business or making any material change in the nature of the business of the Corporation or any of its subsidiaries;" (4.5(o)) or

    d.   "entering into any agreement or taking any action to carry out any of the foregoing matters referred to in the foregoing provisions of this section…" (4.5(p)).

46.    Moreover, section 4.6 of the Shareholders Agreement provides for, *inter alia*, a number of "Matters Requiring Board Approval," including by not limited to:

    a.   "during any fiscal year of the Corporation, selling, exchanging, or disposing of any asset of the Corporation or any subsidiary for an amount exceeding $10,000, other than dispositions of the ordinary course of business or dispositions provided for in the business plan and budget approved pursuant to section 4.5(m) or dispositions provided for in the production budgets approved pursuant to paragraph (c) of this section" (4.6(b)); or

    b.   "matters with respect to each Picture[1] . . . . all material contracts or any amendment or extension of any material contract relating to the development, financing, production, distribution or other exploitation of each Picture or any subsidiary or ancillary rights thereto…" (4.6(c)(vii)); or

    c.   "entering into any material contract or any amendment or extension of any material contract involving consideration of at least $10,000 and which is outside of the annual business plan and budget approved pursuant to section

---

[1] "Pictures" is defined as "television or theatrical motion pictures of any kind, including without limitation, feature length films, movies of the week, television specials, television series, and television interstitials[.]"

4.5(m)  and which is outside the production budgets approved pursuant to paragraph (c) of this section…" (4.6(d)).

47.     The Shareholders Agreement is binding on Hopley, Lenz, and Shannon and serves to govern the continued use of the Nanalan' Property.

48.     Following the end of Nanalan's run in the United States in 2013, it became newly popular when, in the late 2010s and early 2020s, Nanalan' went viral, appearing on websites including Tumblr and YouTube.  Nanalan' also went vial on TikTok in late 2023.  This phenomenon was widely reported.

49.     Seeking to capitalize on Nanalan's renewed fame and popularity, on or about May 2023, Shannon began exploiting the Nanalan' Property via Cameo, Etsy, e-commerce, and other social media platforms.

50.     Defendants made unauthorized use of the NANALAN' trademark to engage in this scheme.

51.     Shannon did not seek approval from 3J's shareholders or of 3J's board.  Moreover, 3J's received no prior notice or request for consent.

52.     Shannon's actions violate the Shareholders Agreement: these actions were, respectively, not approved by "Shareholders holding more fifty percent (50%) of the total number of voting shares in the capital of the Corporation," nor were they approved by the 3J's board, as called for by Sections 4.5 and 4.6 of the Shareholders Agreement.

53.     Undeterred, Shannon proceeded to exploit 3J's property for his personal gain.

54.     On information and belief, without limitation, Shannon:

      a.  Engaged in unauthorized use of the Nanalan' Property by posting videos to Cameo featuring characters from Nanalan', for which Defendants received

11

monetary compensation. Specifically, on or about July 2023, Shannon unilaterally decided to start appearing on the Cameo platform as the Nanalan' character, Mona, a character that belongs to 3J's;

b. Opened an e-commerce store on Etsy called, "nanalanofficial," which advertised itself as "The official Etsy Shop of Nanalan.'" On information and belief, Shannon consummated 6,014 sales of items including but not limited to mugs, stickers, magnets, clothing, tote bags, and notebooks, featuring characters and/or phrases associated with the Nanalan' Property, for which Defendants received monetary compensation;

c. Opened an e-commerce store on Amazon selling "Storytime with Nana," a collection of sixteen e-books that can be purchased as a group or individually;

d. Opened social media accounts on YouTube, TikTok, Instagram, Twitter, and Facebook with the handle @nanalanofficial, where Shannon posted videos and images featuring characters, phrases, and/or scenes associated with the Nanalan' Property; and

e. Collaborated with the e-commerce website Uncute on the "Official Tee – Who's That Wonderful Girl," which is described as having been, "Designed in collaboration with Nanalan' creator, and our dear friend, Jamie Shannon[,]" for which Defendants received monetary compensation.

55. Defendants also repeatedly invoked and/or have used the NANALAN' trademark, without Plaintiffs' permission, in the course of his unauthorized activities.

56. Defendants made no effort to hide these actions from the public.

12

57.     On November 21, 2023, The New York Times interviewed Shannon about the renewed popularity of Nanalan'.  The article reported, "In addition to reposting old content, Mr. Shannon, 51, has started making new videos with the "Nanalan'" puppets for social media.  Shannon discussed the show's newfound audience and weighed in on why nostalgia reigns supreme online."  Madison Malone Kircher, "'Who's That Wonderful Girl?  Could She Be Any Cuter?'"  *The New York Times*, https://www.nytimes.com/2023/11/21/style/whos-that-wonderful-girl-nanalan.html.

58.     In the interview section of the article, the reporter asked, "Mona recently joined Cameo, a platform that allows celebrities to send video messages to fans for a fee.  What's that like?"  Shannon responded, "I was trying to join Cameo so long ago, and I guess they weren't accepting puppets.  It's great, I love it.  It's like four or five videos a day.  Touching stuff, too.  People say, 'Grandma died, can you …?'  So I do a lot of pep talks."  *Id.*

59.     Without limitation, 3J's shareholders had not granted Shannon authority to speak on the record on Plaintiffs' behalf, nor were the actions described in the article and interview authorized by Plaintiffs.  Shannon reportedly was making "new videos" with the Nanalan' Property's character, Mona.  And Shannon admitted to engaging in unauthorized use of the Nanalan' Property by posting videos on Cameo featuring the Nanalan' character, Mona.

60.     Defendants required a platform to receive and process payments as Shannon monetized his unauthorized use of the Nanalan' Property.  Shannon utilized a Shopify storefront to process payments and gave Puppet Island's bank account information to receive payments— not 3J's—thus diverting payments to Defendants that, of right, should have been directed to 3J.

61.     As Defendants embarked on this scheme, Shannon directed payments from Cameo, Etsy, and other e-commerce and social media platforms to Puppet Island, a corporation over which Shannon has total control.

62.     Under the terms of the Shareholders Agreement, Hopley, Lentz, and Shannon each enjoyed a 33.3% ownership stake in 3J's and would receive a pro-rata share of its profits.

63.     For nearly a year and-a-half, Shannon conducted the business of 3J's unilaterally through his personal company, Puppet Island, without the agreement of either Hopley or Lenz, and took the profits of his exploitation of the Nanalan' Property for himself.

64.     Without limitation, Shannon unilaterally monetized 3J's property to his sole benefit and without the consent of either Hopley or Lenz, contrary to sections 4.5(a), (m), (o) and (p) and 4.6(b), (c)(viii) and (d) of the Shareholders Agreement and in a manner that was oppressive to Plaintiffs' interests.

65.     Shannon was not transparent with 3J's about his endeavors.  In fact, Plaintiffs only learned of many of Shannon's activities, including his Cameo appearances, after-the-fact and in media reports.  Shannon purposefully evaded Plaintiffs' efforts to understand the nature and extent of Shannon's actions.

66.     Nor did Shannon provide a full accounting of all revenue earned from his unauthorized actions.  To date, Defendant *still* has failed to produce such an accounting as to the monies he personally received directly or indirectly.

67.     Once Plaintiffs discovered Defendants' scheme, they sought to resolve the issues detailed above, including making numerous requests of Shannon to turn over all accounting information detailing revenues, including but not limited to bank statements, revenue statements

from Cameo, e-commerce platforms, and, and social media, and other proof of revenue from each revenue source.

68.     After nearly a year of requesting accounting information, Plaintiffs learned that: (a) Puppet Island Inc. had earned in excess of $1 million in gross revenues (the net revenues are still unknown) and (b) Shannon had taken many hundreds of thousands of dollars for his own personal use.

69.     Shannon unjustly enriched himself at the expense of other 3J's shareholders, namely, Plaintiffs.

70.     To the extent that Plaintiffs approved of any Defendants' actions—which Plaintiffs categorically did not—Defendants were not entitled to the sole use of these funds; these revenues should have been distributed pursuant to the Shareholder Agreement.

71.     Upon information and belief, as well as the limited accounting records provided to Plaintiffs by Shannon, Shannon used hundreds of thousands of Nanalan'-related income on his own personal mortgage payments; a Canadian Emergency Business Account loan repayment; Shannon's personal and Puppet Island's taxes; and other personal investments.

72.     Shannon had no authority to use 3J's funds in this manner or to use 3J's property solely to his benefit.

73.     During 2024, the Parties attempted to negotiate.  Despite repeated requests to provide information to Plaintiffs, Shannon's disclosures were rare and incomplete.

74.     On or about October 9, 2024, Shannon agreed to deposit CAD 400,000 into a shared 3J's account as a "good faith" gesture as the parties sought to work out their financial issues. Shannon also agreed to deposit Cameo revenues into a 3J's account.  Despite these steps to mitigate

15

this dispute, Plaintiffs demand confirmation and proof of all sources of revenue Defendants received in connection with the unauthorized use of the Nanalan' Property.

75.     Following the October 2024 agreement concerning Cameo revenue, Shannon refused to transfer post-October 2024 revenues from Cameo to a 3J's account.

76.     And even after Shannon shared access to the Nanalan' social media accounts with Plaintiffs, Shannon continued to post content without discussing same, contrary to Plaintiffs' express requests that he cease his unilateral actions.

77.     Between October 2024 and January 2025, Shannon made little progress in providing the complete accounting that Plaintiffs demanded.

78.     On or about December 17, 2024, Lenz emailed Shannon, stating:

> The truth is you took a calculated risk to run the business of Nanalan'
> through your own company, Puppet Island, which you had no authority
> to do.  In the earliest emails when the idea of putting the episodes on
> YouTube came about, you had expressed that you were willing to "do
> whatever is necessary for reporting and financials" (see below)  It took
> almost a year to present an incomplete accounting, and we are still
> waiting for a report on income from April 2024 to present.
>
> You have continued to receive income from Cameo and Etsy.  You
> even mentioned it on one of our calls.  If you indeed wanted to
> overcome mistrust, I would have thought that sending the Cameo funds
> that rightfully belong to the company and any Etsy funds that were
> mistakenly kept, as Kaitlyn wrote us about, would have been sent by
> now as the agreement was that on October 9th, all of the funding

sources that you were collecting for Puppet Island would have been transferred to 3J's. You have also promised your new accounting, and we are still waiting.

You have left us with very little choice but to proceed with what we think is in the best interest of the company, including giving notice to any companies, platforms, agencies or representatives connected to Nanalan, that due to a dispute among the owners, permission to use it's [sic] Characters is suspended until further notice.

79. Following this notice to Shannon, Plaintiffs sent notices to platforms on which Defendants exploited 3J's property to stop ongoing breaches of the Shareholders Agreement and unauthorized use of 3J's property.

80. On or about January 8, 2025, Lenz contacted Cameo's Intellectual Property team, sending a Digital Millenium Copyright Act ("DMCA") notice regarding the use of 3J's Nanalan' Property by Shannon on Cameo.

81. In response, on or about January 8, 2025, Cameo disabled the pages Lenz identified in the DMCA notice.

82. On or about February 12, 2025, Cameo informed Lenz that it had received a DMCA notice concerning Plaintiffs' use of the Mr. Meaty Property on Cameo.

83. 3J's shareholders are the creators and co-owners of the Mr. Meaty Property, but the copyright to same is held by a different entity as a result of an assignment by 3J's. On information and belief, Shannon filed the DMCA notice against Plaintiffs' use of the Mr. Meaty Property on Cameo. Plaintiffs were well within their rights to use the Mr. Meaty Property under the terms of the Shareholder Agreement.

17

84. Shannon has also used the Mr. Meaty Property on Cameo, and sought to monetize use of same solely for Shannon's personal benefit, at the expense of 3J's other shareholders, namely, Plaintiffs.

85. Defendants' conduct—making unauthorized use of the Mr. Meaty Property—is a characteristic behavior in Defendants' pattern of engaging in unfair competition.

86. Defendants have sought to benefit from Plaintiffs' vision, goodwill, and ability to hold themselves out as the creators of the Mr. Meaty Property.

87. These actions are part of a repeated set of behaviors to disadvantage Plaintiffs and monetize Plaintiffs' property and NANALAN' trademark without authorization.

88. Moreover, Defendants' tortious acts and unauthorized use of the Mr. Meaty Property has unduly exposed 3J's, and its shareholders, Hopley and Lenz, to liability, as 3J's previously assigned the rights to the Mr. Meaty Property to MTV Network.

89. Shannon has consistently acted in his own self-interest rather than in the best interests of the company or its shareholders, and without transparency or accountability. He has provided only partial revenue accountings and has thereby harmed 3J's and Plaintiffs' interests as directors and shareholders of the company, including by portraying himself externally as the standard-bearer for Nanalan'.

## COUNT I

## UNFAIR COMPETITION 15 U.S.C. § 1125(a)

90. Plaintiffs reallege and incorporate herein by reference each of the foregoing allegations as if fully set forth herein.

91. Defendants' acts constitute the use, in interstate commerce, of false or misleading descriptions of fact or false or misleading representations of fact likely to cause confusion, or to cause mistake, or to deceive as to the nature and extent of the affiliation, connection, or association

of Defendants with Plaintiffs, as to the source of the business operations provided by Plaintiffs, in violation of 15 U.S.C. § 1125(a)(1)(A).

92.     Defendants' acts are material in that they are likely to influence purchasing decisions by members of the public.

93.     Defendants' acts were intentional, willful, and done with full knowledge.

94.     Defendants' acts have caused and will continue to cause irreparable harm and injury to Plaintiffs.  Unless Defendants are enjoined from further actions, Shannon will continue his illegal acts and cause immeasurable damage to the goodwill and reputation of Plaintiffs.

95.     In addition, as a result of Defendants' conduct, Plaintiffs have been damaged in an amount to be determined at trial, plus interest.

96.     In addition to actual damages and any profits Defendants derived from their improper conduct, this is an exceptional case within the meaning of 15 U.S.C. § 1117(a), entitling Plaintiffs to recover their attorneys' fees.

## COUNT II

### TRADEMARK INFRINGEMENT 15 U.S.C. § 1125(a)

97.     Plaintiffs reallege and incorporate herein by reference each of the foregoing Paragraphs as if fully set forth herein.

98.     Without the authorization or consent of 3J's, Defendants have used the NANALAN' trademark in a false and misleading manner.

99.     Further, Defendants' promotion of Puppet Island in U.S. commerce is and has been competing with 3J's interests in the Nanalan' Property and NANALAN' trademark.

100.     Defendants' unauthorized use of the NANALAN' trademark is likely to cause consumer confusion, mistake, and/or deception in the relevant market(s).

101.    Defendants' conduct constitutes willful trademark infringement in violation of 15 U.S.C. § 1125(a).

102.    In addition to actual damages and any profits Defendants derived from the improper conduct described herein, this is an exceptional case within the meaning of 15 U.S.C. § 1117(a), entitling Plaintiffs to recover their attorneys' fees.

**COUNT III**

**TRADEMARK DILUTION UNDER 15 U.S.C. § 1125(c)**

103.    Plaintiffs reallege and incorporate herein by reference each of the foregoing Paragraphs as if fully set forth herein.

104.    The NANALAN' trademark is famous and widely recognized by the general public.

105.    Without the authorization or consent of 3J's, Defendants have used the NANALAN' trademark in a false and misleading manner and have profited from such misuse in interstate commerce.

106.    Defendants' use of the NANALAN' trademark began after the renewed popularity of the Nanalan' Property.

107.    The recent and renewed attention to the NANALAN' trademark and the Nanalan' Property due to its success and virality on social media has furthered its wide recognition.

108.    Defendants' actions have blurred the public's knowledge of the NANALAN' trademark and caused dilution to its distinctive quality, reputation, and goodwill.

109.    Defendants' conduct constitutes willful trademark dilution in violation of 15 U.S.C. § 1125(c).

110.   In addition to actual damages and any profits Defendants derived from this improper conduct, this is an exceptional case within the meaning of 15 U.S.C. § 1117(a), entitling Plaintiffs to recover their attorneys' fees.

## COUNT IV

### DECEPTIVE ACTS AND PRACTICES UNDER 815 ILCS § 510

111.   Plaintiffs reallege and incorporate herein by reference each of the foregoing allegations as if fully set forth herein.

112.   Defendants engaged in a consumer-oriented act or practice by using the NANALAN' trademarks in connection with his efforts to monetize 3J's Nanalan' Property for Defendants' sole benefit in a false and misleading manner.

113.   Defendants' foregoing actions have been intentional.

114.   Defendants' conduct is likely to cause confusion and constitutes deceptive acts and practices in violation of 815 ILCS § 510.

## COUNT V

### INJURY TO BUSINESS REPUTATION AND DILUTION UNDER 765 ILCS § 1036/65

115.   Plaintiffs reallege and incorporate herein by reference each of the foregoing allegations as if fully set forth herein.

116.   3J's owns the trademark NANALAN'.

117.   The trademark NANALAN' is inherently distinctive and closely associated with 3J's business and reputation, having come to represent the wholesome television show enjoyed by generations of children and adults.

118.   Defendants' misuse of 3J's NANALAN' trademark will ultimately dilute the value and distinctive quality of the trademark NANALAN' within the meaning of 765 ILCS § 1036/65.

Defendant's conduct constitutes injury to business reputation and dilution in violation of 765 ILCS § 1036/65.

## COUNT IV

### TRADEMARK INFRINGEMENT AND UNFAIR COMPETITION UNDER 815 ILCS § 505/1 *et seq.*, 815 ILCS § 510/1 *et seq.*, AND COMMON LAW

119.    Plaintiffs reallege and incorporate herein by reference each of the foregoing allegations as if fully set forth herein.

120.    Plaintiffs' ability to attract and develop business opportunities to exploit and monetize the Nanalan' Property depends on the ability to control the nature of use and dissemination of same.

121.    Defendants have repeatedly misappropriated and engaged in unauthorized use of the Nanalan' Property and the NANALAN' trademark.

122.    Defendants have profited from the improper and unauthorized use of the Nanalan' Property.  Through such conduct, Defendants gained an improper competitive advantage over Plaintiffs that, *inter alia*, caused or may cause Plaintiffs to lose out on business that they would have otherwise obtained.

123.    Relatedly, Defendants' actions have provided Defendants with competitive advantages with respect to profits to Puppet Island, gaining Defendants access to business opportunities, fame, and false association with the property over which he is not the exclusive owner.  Defendants would not have these advantages but for the improper conduct set forth above.

124.    Defendants have engaged in trademark infringement and unfair competition under 815 ILCS § 505/1 *et seq.*, 815 ILCS § 510/1 *et seq.*, and Illinois common law.  As a result of Defendants' trademark infringement and unfair competition, Plaintiffs have suffered damages in an amount to be proven at trial.

## COUNT VII

## UNJUST ENRICHMENT

125.    Plaintiffs reallege and incorporate herein by reference each of the foregoing allegations as if fully set forth herein.

126.    From on or about mid-2023 through today, Defendants have been unjustly enriched by wrongly converting, taking, and/or utilizing monies paid to Puppet Island in connection with Defendants' unauthorized use of the Nanalan' Property, all to the detriment of Plaintiffs.

127.    Defendants gained, and continue to gain, substantial revenue from unauthorized use of the Nanalan' Property.

128.    On information and belief, Defendants have taken funds received for exploiting the Nanalan' Property, which rightfully belong to all of 3J's shareholders, and used them to Shannon's personal benefit.

129.    Shannon has failed to provide an accounting of all funds received in connection with Defendants' unauthorized use of the Nanalan' Property, to the detriment of Plaintiffs. Plaintiffs therefore are not able to ascertain the extent of Shannon's personal enrichment.

130.    As a direct and proximate result of Defendants' actions, Plaintiffs have been substantially injured, and there is due and owing to Plaintiffs from Defendants, sums of money for unauthorized use of the Nanalan' Property, including lost income and diminution of the value of the Nanalan' Property.

131.    Defendants have engaged in unjust enrichment, and as a result, Plaintiffs have suffered damages in an amount to be proven at trial.

## COUNT VIII

## TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

132. Plaintiffs reallege and incorporate herein by reference each of the foregoing Paragraphs as if fully set forth herein.

133. Plaintiffs reasonably expected that they, as shareholders of 3J's, would be able to enter into business relationships with, *inter alia*, Cameo, Etsy, Amazon, and other e-commerce and social media platforms.

134. Shannon, as a shareholder and co-creator the Nanalan' Property and NANALAN' trademark has usurped 3J's ability to enter into valid contracts in pursuit of monetizing 3J's property to benefit its shareholders.

135. Defendants, by and through the actions described herein, have prevented Plaintiffs' legitimate expectations of promoting and monetizing 3J's property.

136. Defendants have engaged in tortious interference with prospective economic advantage. As a result of Defendants' actions, Plaintiffs have suffered damages in an amount to be proven at trial.

## DEMAND FOR JURY TRIAL

137. Plaintiffs hereby request a jury trial on all issues and claims contained herein that are eligible for trial by jury.

## PRAYER FOR RELIEF

138. **WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment in its favor on all counts of this Complaint and grant Plaintiffs the following relief:

139. Permanently enjoin and restrain Defendants, successors or assigns, and all persons or entities acting in concert or in participation with Defendants, from directly or indirectly taking any further acts constituting trademark infringement under 15 U.S.C. § 1125, breach of contract, tortious interference with contract, unfair competition, and unjust enrichment, and awarding

Plaintiffs a) actual damages and profits resulting from Defendants' violative acts, in an amount to be determined at trial, plus interest; and b) attorneys' fees and costs;

140.     Order Defendants to provide Plaintiffs an accounting of any and all monies, profits, gains, and advantages derived by Defendants through the aforementioned acts;

141.     Award Plaintiffs their reasonable attorneys' fees, taxable costs, and disbursements, pursuant to 18 U.S.C. § 505;

142.     Award Plaintiffs pre-judgment and post-judgment interest; and

143.     Award Plaintiffs such other and further relief as the Court deems just and proper.


Dated: February 28, 2025
        Chicago, Illinois

Respectfully submitted,

By:     DENTONS US LLP

        /s/ Daniel A. Schnapp (*pro hac vice* forthcoming)
        Daniel A. Schnapp
        Samuel J. Weiner (*pro hac vice* forthcoming)
        1221 Avenue of the Americas
        New York, NY 10020-1089
        Phone:  (212) 768-6748
        Fax:  (212) 768 6800
        daniel.schnapp@dentons.com
        samuel.weiner@dentons.com

        /s/ Samuel Fifer
        Samuel Fifer
        Joshua A. Faucette
        233 South Wacker Drive
        Suite 5900
        Chicago, IL 60606
        Phone:  (312) 876-8000
        samuel.fifer@dentons.com
        joshua.faucette@dentons.com

        *Attorneys for Plaintiffs 3J's Production, Inc., Jason Hopley, and Jack Lenz*